JODI LINKER, Bar No. 230273
Federal Public Defender
Northern District of California
KARTHIK RAJU, Bar No. 311303
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        Karthik_Raju@fd.org

Counsel for Defendant MITCHELL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RONNIE MITCHELL,<br><br>Defendant. | **Case No.:** CR 25–384 SI<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:**  Courtroom 1, 17th  Floor<br>**Hearing Date:**  May 8, 2026<br>**Hearing Time:**  11:00 a.m. |

## INTRODUCTION

Ronnie Mitchell has been sufficiently punished for making the unfortunate decision to walk away from the halfway house with just weeks left on his sentence. Rather than spend just three weeks more in a halfway house, he was returned to custody, lost good time credits, served an additional two full months in prison on his underlying case, and has now served an additional five months in custody. His walkway has thus resulted in over seven additional months in custody, more than enough to serve the goals of sentencing. A sentence of time-served is reasonable and appropriate.

## BACKGROUND

This Court sentenced Mr. Mitchell to a 40-month sentence for being a felon in possession of a

firearm. On August 5, 2025, having served the vast majority of that sentence at USP Atwater—a notoriously inhospitable federal penitentiary—Mr. Mitchell reported to the Oakland halfway house with seven weeks remaining on his sentence. Immediately upon his arrival there, he knew a lot was being asked of him to remain there.

One of his brothers was shot to death in Vallejo in 2021. *See* Declaration of Karthik Raju (hereinafter "Raju Decl."), Ex. A (news articles reporting the fatal shootings of Mr. Mitchell's brothers). Just two years later, on March 11, 2023, another brother, Paris Moffett, was shot, paralyzed, and then murdered in a targeted killing inside Kaiser's Lake Merritt Healthcare Center—a secured rehabilitation facility. *Id*. The halfway house where Mr. Mitchell was placed at 205 MacArthur Boulevard sits literally steps away from that facility. *See* Raju Decl., Ex. B (map showing distance between healthcare center and halfway house). For Mr. Mitchell, that was not an abstract coincidence. It meant that the place he was required to live was inseparable from the location where his brother had been hunted down and killed in what was supposed to be a protected environment.

While at the halfway house, Mr. Mitchell repeatedly expressed fear for his safety. Family members relayed that people were aware of his presence there and that he could be at risk. He asked staff to be moved to home confinement at his father's home in Stockton—a placement consistent with the reentry plan documented at intake. *See* Raju Decl., Ex. C at Bates -000017. That request was not speculative or opportunistic. It reflected the exact plan he had at the time of his original sentencing and the plan documented in the halfway house records as his next step upon release. He was told to wait. He did. When he followed up two weeks after first asking, he was told no. He would have to remain where he was until his release date.

Just 22 days before his scheduled release, with his requests to transfer unanswered, he decided he could not take it anymore and walked away.

A month later, on October 8, 2025, officers located and arrested Mr. Mitchell. The circumstances leading to that arrest are in dispute and are the subject of a pending state court proceeding.[1]

---

[1]Because the state case is pending, Mr. Mitchell will not discuss the facts in depth here. Nonetheless, it is worth noting that the police report regarding Mr. Mitchell's arrest indicates that he

DEFENDANT'S SENTENCING MEMORANDUM
*MITCHELL*, CR 25–384 SI

Mr. Mitchell was returned to federal custody to serve out the remainder of his 40-month federal sentence. Rather than being released on September 24, Mr. Mitchell served an additional two months until December 9, 2025. In the meantime, on November 12, 2025, the federal government filed the instant indictment against Mr. Mitchell charging him with escape. In the normal course, Mr. Mitchell would have been brought to federal court for his initial appearance on the indictment directly from his confinement. He wasn't. For unknown reasons, Mr. Mitchell was instead released to the streets on December 9, 2025.

Mr. Mitchell did not flee, evade, or avoid. Instead, knowing of the instant federal charge, he immediately contacted undersigned counsel to determine what he should do. He reported to his probation officer in Oakland on December 10 and again on December 11. He appeared before Your Honor on December 12, 2025, at which time the government requested that he be remanded to custody. The Court specifically noted that Mr. Mitchell had appeared as directed and declined to remand him, instead directing the government to proceed in magistrate court several days later. Mr. Mitchell again appeared as directed on December 15—accompanied by his father, mother, and wife—and continued to appear in subsequent magistrate court proceedings before Judges Thomas S. Hixson and Alex G. Tse on December 19 and December 22. In the meantime, he began making preparations to relocate to Stockton to live with his father and resume work in his father's charter fishing business, and he advised his probation officer of his desire to immediately relocate there. Unfortunately, he was never able to put that plan into action because the Magistrate Judge granted the government's motion for detention and Mr. Mitchell reported into custody on December 22, where he has remained since. The primary stated basis for the Magistrate Judge's order of detention was the state court evasion case that is notably in dispute.

In total, Mr. Mitchell has now spent an additional seven months in custody for his conduct.

---

was being pursued based on a 2021 warrant. As Mr. Mitchell has been in and out of custody numerous times since 2021, it seems incredible that such a warrant was still active at the time of this incident. At a minimum, that context raises questions about the circumstances leading to the encounter and underscores why the Court should be cautious in assigning weight to unproven allegations from that event.

DEFENDANT'S SENTENCING MEMORANDUM
*MITCHELL*, CR 25–384 SI

**DISCUSSION**

**I.    THIS WAS NOT AN ATTEMPT TO FLEE SUPERVISION, BUT A MISGUIDED DECISION MADE UNDER STRESS**

Mr. Mitchell left the halfway house on September 2, 2025, just 22 days before his scheduled release date of September 24. That timing matters. This was not a person abandoning a lengthy custodial term or attempting to disappear for months or years. He was at the very end of his sentence, weeks away from release, with a concrete plan already in place for where he would go and how he would live. The decision to leave was not well considered, but it did not represent a desire to escape supervision in any meaningful sense. It was a short-lived, situational decision made under pressure.

The pressure he experienced was real. Immediately upon his arrival there, he knew a lot was being asked of him to remain there. Mr. Mitchell's family has been marked by extraordinary violence. Two of his brothers have been shot and killed. But more than that, one was tracked down and murdered just steps from the halfway house in what was supposed to be a secure environment. This took an emotional toll on him, which only escalated when he became aware of threats to him personally given historical issues in the area. Bucking his past patterns, he did not get a firearm, and he did not leave immediately; instead, he tried to avail him of the process available to him. He repeatedly requested to be transferred to home confinement at his father's home in Stockton. After those requests were not granted, just 22 days before his scheduled release, he decided he could not take it anymore and walked away.

Mr. Mitchell is not suggesting that this excuses leaving the halfway house. It does not. But it explains why Mr. Mitchell's conduct was not the product of defiance or disregard for the law. Faced with his fears, in a location tied directly to his family's trauma, and after his attempts to secure a safer, structured alternative went unanswered, he made a poor decision. As his father wrote, "While I do not condone his decision, I believe it is important to consider the circumstances he perceived at the time. Ronnie expressed fear for his safety due to threats and incidents occurring in close proximity to the facility, including the tragic loss of his brother nearby." Raju. Decl., Ex. D (support letters from Ronnie's father, wife, and cousin). That is the context in which the Court must evaluate what happened.

DEFENDANT'S SENTENCING MEMORANDUM
*MITCHELL*, CR 25–384 SI

## II. MR. MITCHELL HAS ALREADY DEMONSTRATED—THROUGH HIS CONDUCT, NOT WORDS—THAT HE WILL COMPLY WITH COURT ORDERS

If the Court's concern is whether Mr. Mitchell is someone who will appear and comply, his recent conduct provides a clear answer. When Mr. Mitchell was—mistakenly—released from custody on December 9, 2025, instead of being transferred in custody to face the instant escape case, he did not flee. If he were inclined to do so, that was the moment to do it. He knew about the case. He knew detention was a real possibility. And yet, instead of disappearing, he immediately contacted counsel and followed every instruction he was given. He reported to his probation officer the day after his release and the day after. He appeared before this Court—in street clothes and on his own volition—the day after that, at which time the government moved for his remand. This Court denied that request, recognizing that Mr. Mitchell's appearance reflected his commitment to showing up and following the Court's directives, but nonetheless gave the government another bite at the apple before the magistrate court. He continued to show up as directed until he was eventually remanded on December 22 in large part based on facts that are disputed and part of a separate pending state court matter.

Even knowing that the government was actively seeking his detention and that each appearance carried the real possibility that he would be taken into custody did not deter him. He appeared every time. He complied with probation. He remained in contact. And he did so until he was ultimately remanded. That sequence of conduct is not consistent with someone who is unwilling to submit to the authority of the Court. It is consistent with someone who understands the seriousness of his situation and is prepared to face it.

Mr. Mitchell's conduct distinguishes his case from the typical "escape" case and should carry significant weight in assessing both risk of flight and respect for the law.

## III. MR. MITCHELL HAS A STABLE, PRE-EXISTING PLAN AND STRONG FAMILY SUPPORT THAT POSITION HIM FOR SUCCESS

Mr. Mitchell does not come before the Court with a newly constructed plan designed to avoid custody. The plan has been the same from the beginning. At the time of his original sentencing, he intended to leave the Bay Area and relocate to his father's home in Stockton. The halfway house records confirm that same plan. Raju Decl., Ex. C. He was to complete his placement and then go

DEFENDANT'S SENTENCING MEMORANDUM
*MITCHELL*, CR 25–384 SI

directly to Stockton, where he would live with his father and work in his father's sportfishing business. That plan existed before September 2, 2025. It existed while he was at the halfway house. And it exists today.

His father has confirmed that Ronnie will reside with him at his home in Stockton, where "he will have his own room in [a] five-bedroom residence, providing him with a stable and supportive living environment." Raju Decl., Ex. D. He will also return to work in a legitimate, long-standing business that his father has operated for 18 years. *Id*. As his father explained, "He has extensive prior experience working alongside me as a deckhand. Upon his return, he will resume those responsibilities, with the added goal of advancing toward obtaining his captain's license." *Id*. This is not speculative employment. It is a continuation of work Mr. Mitchell has already done, in a structured environment, under the direct supervision of a family member invested in his success. Importantly, this plan removes Mr. Mitchell from the environment that gave rise to the conduct at issue, placing him in a stable home, with steady employment, and with a clear path forward.

Mr. Mitchell's support network reinforces the credibility of that plan. His wife, Treasure Mitchell, describes him as "a kind, respectful, and dependable individual" who has "always been someone his family and friends could rely on without hesitation." Raju Decl., Ex. D. She explains that she has "witnessed his growth, maturity, and commitment to becoming a better man," and that he "accepts responsibility for his actions and is sincerely dedicated to learning from his mistakes." *Id*. His cousin, Rayniesha Hill, similarly describes him as "family-oriented and dedicated," someone who "is willing to help his family whenever needed and does not hesitate to go the extra mile for others," and who has long encouraged those around him to pursue stability and independence. *Id*. These are not recent observations offered for litigation; they reflect years of lived experience with the person Mr. Mitchell has been and is striving to be.

The letters submitted in support also include direct accounts from those closest to Mr. Mitchell regarding his character and role as a father. Mr. Mitchell's mother, Delicia Martin, writes that she "know[s] Ronnie to be a good young man that love[s] his family and is very happy and grateful for his daughter, Ra'Niyah," describing him as "a generous, loving, smart person," and explaining that he raised concerns about his safety while at the halfway house and that, with family support, he "can,

DEFENDANT'S SENTENCING MEMORANDUM
*MITCHELL*, CR 25–384 SI

and will be successful." Raju Decl., Ex. D. Similarly, his child's mother, Tahmaya Leslie, explains that Mr. Mitchell has "demonstrated care, affection, and a genuine desire to be involved in [their daughter's] life," using the limited time he has had to build a meaningful relationship with her. She describes him as patient, attentive, and engaged—someone who plays with his daughter, supports her learning, and checks in on her emotional well-being—and notes that he has made efforts to remain involved even when they are apart, concluding that their relationship "contributes to her sense of stability and emotional development." *Id*. Together, these accounts reinforce that Mr. Mitchell's commitment to family and fatherhood is not aspirational—it is already reflected in how he has chosen to spend the limited time he has had with his daughter.

What makes this record particularly compelling is how closely it aligns with what Mr. Mitchell himself said at the outset of reentry and how he has acted when given the opportunity. In intake materials, he identified his core values as "keeping my word and being there mentally, physically and emotionally," and described his goal as a parent as striving to "Be the best dad I can be." Raju Decl., Ex. C at Bates -000040, -000049. He explained that what keeps him going are "my daughter & my family," and acknowledged that he was trying "to learn more for different results other than what I've been getting," while also setting out a concrete plan to work, stating that he "will be working as a deckhand cleaning boats." *Id*. at Bates -000017. That is the same plan he presents today. And his actions reflect those same priorities. His daughter, Ra'Niyah Mitchell, was born while he was in custody in 2022, leaving him only limited time in the community to build a relationship with her, yet he has used that time to be present in her life—to spend time with her and begin forming the bond his incarceration delayed. Taken together, this is not a story of someone speaking aspirationally after the fact, but of someone whose words, plans, and actions all point in the same direction.

Mr. Mitchell's own words reinforce that same picture. *See* Raju Decl., Ex. E (Ronnie Mitchell's Letter to the Court). In a handwritten letter to the Court, he does not minimize what happened, but instead accepts responsibility and explains the circumstances as he experienced them. He writes that he "did everything [he] can do to stay out of harm's way," but felt unheard when his requests for a transfer were denied, and emphasizes that he had "20 days left" on his sentence when he made the decision to leave. *Id*. Most importantly, he looks forward, not backward—asking the

DEFENDANT'S SENTENCING MEMORANDUM
*MITCHELL*, CR 25–384 SI

Court "to give me a chance to prove myself" and expressing a clear desire to return home, be with his daughter, and demonstrate that he can do things differently. *Id*. His words are consistent with the record before the Court: a man who made a poor decision under stress, but who has shown, through his actions since, that he is prepared to comply, to work, and to move forward in a structured and law-abiding way.

Taken together, these materials present a consistent and credible picture. Mr. Mitchell has maintained the same plan from the outset, is supported by a strong and stable family network, and has demonstrated a commitment to moving forward in a structured, law-abiding way. Under these circumstances, a sentence of time served followed by continued supervision is sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. Any additional term of incarceration would be greater than necessary.

## IV.    MR. MITCHELL'S CONDUCT WAS A CONTINUOUS ESCAPE FROM NON-SECURE CUSTODY, AND § 2P1.1(b)(3)'S FOUR-LEVEL REDUCTION APPLIES

The Guidelines' treatment of halfway house walk-away cases reflects a clear judgment by the Sentencing Commission: these cases are categorically less serious than escapes from secure custody. Under U.S.S.G. § 2P1.1(a)(1), the base offense level for escape from custody based on a felony conviction is 13. But § 2P1.1(b)(3) expressly recognizes that not all escapes are alike, directing a four-level reduction where, as here, the defendant leaves non-secure custody such as a residential reentry center. The only basis for denying that reduction here is the government's possible claim that Mr. Mitchell committed a separate, disqualifying offense while away—namely, the alleged high-speed evasion on October 8, which remains unproven and pending in state court. But that framing artificially slices what is, by definition, a continuing offense.

Escape does not end the moment a person walks out the door of a halfway house; it continues until the person is returned to custody. *See United States v. Bailey*, 100 S. Ct. 624. The alleged conduct on October 8 immediately preceding his arrest—alleged evading of law enforcement—was not a new, independent course of criminal conduct unrelated to the escape. It was the final chapter of the same continuous episode: a person still on escape status attempting to avoid immediate arrest. The fact that the claimed evasion was allegedly high-speed does not transform its character for

purposes of § 2P1.1(b)(3); it remains conduct directly tied to, and inseparable from, the ongoing continuing escape. Reading the guideline to categorically exclude any defendant who resists returning to custody would swallow the rule, as nearly every escape case involves some degree of avoidance of law enforcement. The Commission did not intend that result. Nor should a state court allegation—one that remains pending and therefore can be appropriately adjudicated and sentenced by the state court—be used to strip Mr. Mitchell of a reduction that otherwise squarely applies to his offense conduct.

When properly viewed in context, Mr. Mitchell's case fits precisely within the heartland of § 2P1.1(b)(3): a short-lived walk-away from non-secure custody, followed by recapture. Applying the four-level reduction reduces the offense level from 13 to 9, and after acceptance of responsibility to 7. At criminal history category VI, his correct advisory guideline range is 15 to 21 months.

If the Court declines to apply the four-level reduction, the resulting guideline range would be 27 to 33 months—a range that significantly overstates the seriousness of this short-lived, non-secure walk-away and is inconsistent with how similar cases are treated in this District.

## V.    THE REQUESTED SENTENCE IS NECESSARY TO AVOID UNWARRANTED DISPARITIES IN SENTENCING

The Court must ensure that the sentence imposed avoids unwarranted disparities in sentencing. 18 U.S.C. § 3553(a)(6). It must also "'impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). Several recent sentences in this District for similar halfway house walk-away escape cases, as reflected in the custodial terms imposed, demonstrate that Mr. Mitchell's requested sentence of time served is appropriate and would avoid unwarranted disparities among similarly situated defendants.

1. In *United States v. Kevin Byrd,* **Case No. 20-295 CRB**, Mr. Byrd walked away from the Halfway House and was arrested four and a half months later. When officers attempted to stop him, he fled in his vehicle, driving erratically before abandoning the car and attempting to flee on foot. He was in criminal history category VI and offense level 7, resulting in a range of 15–21 months. The Court sentenced him to time served.

2. In *United States v. Juhun Brown*, **Case No. 20-252 CRB**, Mr. Brown walked away from the halfway house, *four months* shy of his release date for his sentence for his *first* escape from a halfway house case. He was at the halfway house for one month, left, and then committed a new drug offense, for which he was sentenced to a year in state custody. He was in custody for over a year at them time of sentencing. His offense level was 11 and his criminal history category was VI, resulting in a guideline range of 27–33 months. The Court sentenced him to time served to run *concurrent* with his underlying offense, resulting in no additional time on the escape case.

3. In *United States v. Ruben Villegas*, **Case No. 20-417 CRB**, Mr. Villegas walked away from the halfway house after twice testing positive for opiates and remained out for several weeks before he was arrested two blocks away selling $20 worth of heroin to an undercover officer. Later, after being released again to the halfway house, he tested positive for opiates, marijuana, and codeine, was terminated from home confinement, and walked away again. His offense level was 7 and his criminal history category was VI, resulting in a guideline range of 15–21 months. The government recommended an 18-month sentence. The Court nevertheless imposed a sentence of time served.

4. In *United States v. Anthony Hunter,* **Case No. 18-073 RS,** Mr. Hunter was sent to the halfway house to complete the end of his 80-month sentence of imprisonment. Mr. Hunter walked away from the halfway house after being there for 12 days. He was found by law enforcement approximately four months later. He was in criminal history category VI and offense level 7, resulting in a range of 15–21 months. Judge Seeborg sentenced him to four months in custody to run *concurrent* with his underlying sentence. That resulted in Mr. Hunter serving no more than three additional months in custody.

5. In *United States v. Gabriel Munoz*, **Case No. 17-617 EMC**, the defendant walked away from the halfway house less than one month after his transfer there to finish out an 84-month sentence. He was arrested three months later and returned to federal custody. His offense level was 7 and criminal history category was III, resulting in a range of 4–10 months. The Court

sentenced him to two months to run fully *concurrent* with the underlying sentence, which resulted in no additional time for the escape charge.

6. In *United States v. Elia Cortes,* **Case No. 17-004 RS**, the defendant walked away from the halfway house after fighting with other residents. At the time, she had seven months left to serve of her 30-month sentence. Ms. Cortes was on escape status for 21 months before she was rearrested in late 2016. Her offense level was 7 and her criminal history category was III, and she had been in custody for approximately three months at the time of sentencing. She was sentenced to time served.

7. In *United States v. Dierre Johnson*, **Case No. 14-385 RS**, the defendant walked away from the halfway house where he was serving the remainder of his 57-month sentence. Mr. Johnson was eventually arrested after his whereabouts were unknown for two years. The PSR determined that Mr. Johnson was in Criminal History Category VI, but the Court determined he was more appropriately in Criminal History Category IV. He was sentenced to time served (four months) and three months of home confinement.

8. In *United States v. Miguel Angel Bucio*, **Case No. 19-252 SI**, Mr. Bucio walked away from the halfway house with a little over three weeks remaining on a 23-month sentence. He had been at the halfway house for about a month before he left. Shortly thereafter, he was arrested by local law enforcement and subsequently convicted for possession of a switchblade. His offense level was 7 and his criminal history category was V, resulting in a guidelines range of 12–18 months. This Court sentenced him to four months to run *concurrent* to his underlying case.

9. In *United States v. Connell Bradley*, **Case No. 22-77 SI**, Mr. Bradley walked away from the halfway house after refusing to provide a urine sample and remained out until he was arrested approximately ten days later. During that time, he was arrested for burglary and vandalism, ultimately sustaining a conviction for vandalism. His offense level was 11 and his criminal history category was VI, resulting in a guideline range of 27–33 months. The Probation Office recommended a 27-month sentence. This Court imposed a sentence of time served.

10. In ***United States v. Charles Thompson***, **Case No. 13-524 SI**, defendant walked away from a halfway house approximately two weeks after being placed there. He remained out for roughly two months before being apprehended. When he was arrested, he was a passenger in a vehicle containing cocaine, and officers recovered a loaded .45 caliber firearm from beneath his seat. The government argued that this conduct warranted an upward departure and variance, increasing his offense level from 7 to 11, with a criminal history category of VI, resulting in a guideline range of 27–33 months, and requested a sentence at the high end of that range. This Court imposed a sentence of time served.

## **CONCLUSION**

This is a case about context, credibility, and what lies ahead. The context explains why Mr. Mitchell made a bad decision in a moment of fear. Credibility comes not from what he says now, but from what he has consistently shown—his stated intentions at the outset of reentry, the plan he put in place long before this offense, and the people in his life who stand behind him today. That plan upon release—unchanged from the day he entered the halfway house—provides the Court with a clear, structured path forward. It is also important to understand who Mr. Mitchell is outside of this case. He is the father of a young daughter, Ra'Niyah Mitchell, who was born on June 8, 2022, while he was in state custody. As a result, he has had only weeks—not years or even months—out of custody to spend with her. When he has had time in the community, however, he has sought to be present in her life. That reality underscores what is at stake here and reinforces why a sentence that allows him to return to his family and continue in that role is both appropriate and consistent with the purposes of sentencing.

For all the reasons set forth above, Mr. Mitchell respectfully requests that the Court grant a downward variance and sentence him to time served. As he already has a three-year term of supervised release for his earlier case, there is no need for an additional term of supervised release. Such a sentence is reasonable to achieve the goals laid out in § 3553(a), and is sufficient, but not greater than necessary.

Dated:      May 1, 2026                              Respectfully submitted,

                                                     JODI LINKER
                                                     Federal Public Defender
                                                     Northern District of California

                                                                    /S
                                                     KARTHIK RAJU
                                                     Assistant Federal Public Defender